**Edward SERFATY, et al., Plaintiffs,**

v.

**INTERNATIONAL AUTOMATED SYSTEMS, INC., et al., Defendants.**

Civ. No. 2:96–CV–583C.

United States District Court, D. Utah, Central Division.

June 2, 1998.

Brent D. Ward, Salt Lake City, UT, Richard Bemporad, White Plains, NY, for plaintiffs.

Alan L. Sullivan, Salt Lake City, UT, for defendants.

### ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

CAMPBELL, District Judge.

Plaintiffs have brought this lawsuit alleging violations of the securities laws in connection with the trading of Defendant's, International Automated Systems, Inc. ("IAS"), stock during the period of April 3, 1996, through June 27, 1996 ("the class period"). Plaintiffs allege that IAS and its president, Defendant Neldon P. Johnson, made material misrepresentations regarding IAS technology for the purpose of inflating the market price of IAS shares. According to Plaintiffs, when the Defendants failed to produce the promised technology, the price of IAS shares plummeted, causing harm to those who had traded in IAS shares during the class period. Plaintiffs are now asking that this action be certified as a class action pursuant to Fed. R.Civ.P. 23. The proposed class consists of all those who purchased IAS common stock during the class period.

**Discussion**

A. *The Requirements of Rule 23.*

Under Rule 23(a), the following showing must be made: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representatives are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *Reed v. Bowen,* 849 F.2d 1307, 1309 (10th Cir.1988). Here, because they seek certification under Rule 23(b)(3), Plaintiffs must also show that: (1) the questions of law or fact common to the members of the class predominate over those questions affecting individual members only, and (2) a class action is superior to other available methods for fair and efficient adjudication of the controversy. *Amchem Prod., Inc. v. Windsor,* —— U.S. ——, ——–——, 117 S.Ct. 2231, 2245–46, 138 L.Ed.2d 689 (1997).

1. *Plaintiffs' Burden of Proof.*

Plaintiffs contend that in making a determination whether the requirements of Rule 23 are fulfilled, the court must accept the allegations of the complaint as true without examination of the underlying facts. However, such a contention cannot stand in the face of the Supreme Court's statement in *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982):

As we noted in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351, "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" (citations omitted.) Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.

*Id.* at 160–61, 102 S.Ct. 2364. Therefore, to decide whether this law suit should proceed as a class action, the court will examine the evidence presented on this issue.

### 2. The Requirement of Numerosity.

The first question under Rule 23 is whether "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). To satisfy this requirement, the plaintiffs need not show that joinder of all members of the class is impossible, only that it is impracticable. *O'Neil v. Appel,* 165 F.R.D. 479, 488 (W.D.Mich.1996).

 Plaintiffs maintain that because, as of June 30, 1996, there were 980 shareholders of record scattered throughout the United States, and 882,421 shares were traded in 730 transactions during the class period, they have met the requirement of numerosity. What Plaintiffs fail to show is the number of actual purchasers of IAS stock during the class period. Although a similar lack of evidence was fatal to the plaintiffs' claim of numerosity in *O'Neil,* the court concludes that the better-reasoned approach is to find that Plaintiffs' evidence here is sufficient. Trial courts have been willing to make common sense assumptions in order to support a finding of numerosity. *Zeidman v. J. Ray McDermott & Co., Inc.,* 651 F.2d 1030, 1039 (5th Cir.1981). Accordingly, "even where the number of persons who bought stock during the class period is unknown, numerosity can be assumed where the number of shares traded is so great that common sense dictates the class is very large." *Grace v. Per-*

*ception Technology Corp.,* 128 F.R.D. 165, 167 (D.Mass.1989) (citation omitted).

### 3. Adequacy of Representation.

 Defendants argue that there is an inherent conflict among members of the proposed class who bought and sold IAS stock during the class period and those who were only buyers. According to Defendants, this conflict arises from the fact that in any calculation of damages, sellers will necessarily seek to minimize the degree of price inflation that occurred, while buyers will seek the opposite result. However, Defendants' argument at this stage is hypothetical: they fail to point to specific members of the proposed class who both bought and sold IAS stock during the relevant time. Claims regarding theoretical issues that might arise are not sufficient to defeat class certification. *Robertson v. National Basketball Assoc.,* 389 F.Supp. 867, 899 (S.D.N.Y.1975) (class action status will not be denied in the absence of a showing that the alleged potential conflicts are real probabilities and not mere imaginative speculation).

In addition, Defendants' argument focuses on the amount of damages suffered, not on the central issue of alleged wrongdoing: "Any differences in interests among class members in demonstrating the amount of price inflation on a given day are secondary to the predominant interests shared in proving the existence of materially misleading statements and omissions." *In Re Tricord Systems,* No. 3–94–746, 1996 U.S. Dist. LEXIS 20943, at *24 (D.Minn. Apr. 5, 1996). Therefore, the court concludes that Plaintiffs have shown that they can adequately represent the members of the proposed class.

### 4. Common Questions of Law and Fact: The Fraud–on–the–Market Theory.

Rule 23 requires that common questions of law and fact predominate over questions affecting individual class members, and that the claims and defenses of the class representatives be typical of those of the other members of the class. (Fed.R.Civ.P. 23(a)(3), 23(b)(3)). It is here that the real conflict occurs over the propriety of granting Plaintiffs' motion.

The dispute arises over the element of reliance, a necessary component in a case alleging securities law violations. The Supreme Court's decision in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), obviates the necessity that a plaintiff prove reliance and, instead, permits the rebuttable presumption that a plaintiff relied on the integrity of the market price in purchasing his or her shares of stock. The presumption is appropriate only if the company's stock was traded in an "efficient market." Commonly referred to as "the fraud-on-the-market theory," this approach assumes that in an efficient market, all the available information about the company is quickly reflected in the price at which people are willing to buy and sell the stock. *Freeman v. Laventhol & Horwath*, 915 F.2d 193 (6th Cir.1990). Thus, the theory continues, "[i]nvestors rely on the price of the security as an accurate reflection of its worth. They, therefore, rely indirectly on such misrepresentations, even if they do not rely on them directly." *Id.* at 197 (citations omitted). Consequently, "[t]he fraud on the market theory cannot be applied logically to securities that are not traded in efficient markets." *Id.* at 198. Here, the determinative question now becomes whether IAS stock traded in an efficient market, thereby allowing Plaintiffs the benefit of the presumption.

IAS stock is traded on the OTC Bulletin Board, a screen-based quotation system for small or inactively traded companies that is operated by, but is distinct from, the Nasdaq Stock Market. While some courts have held, without further inquiry, that the over-the-counter market is not an efficient market, the wiser approach appears to be a close examination of the evidence to determine whether IAS stock traded in an efficient market. *See, Cammer v. Bloom*, 711 F.Supp. 1264, 1281 (D.N.J.1989).

Courts have cited various factors as probative of the efficiency of a particular market. These factors include: (1) whether there was a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 Registration Statement; and (5) a history of immediate movement of the stock price. *Freeman*, 915 F.2d at 199 (citation omitted).

### a. *Weekly Trading Volume.*

The significance of this evidence was explained by the *Cammer* court as follows:

> The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.

*Cammer*, 711 F.Supp. at 1286.

Although there is some question whether the correct number of IAS shares to be considered as available for trading ("the float") was 9,186,000 or 15,186,1000, this difference is not determinative. Using the larger figure, Plaintiffs' expert, Patrick Sheehan, concluded that IAS stock was actively traded during the class period, basing his opinion on the total number of individual trades (2,730), the total reported volume of trading (882,421 shares), and the fact that trades occurred each day. In addition, Sheehan noted that the volume of trading in IAS stock exceeded the volume trade for the average OTC Bulletin Board securities. (Sheehan Aff. ¶¶ 10–11.) Charles Cox, Defendants' expert, challenges Sheehan's conclusion that this data is evidence of an efficient market. According to Cox, the figures cited by Sheehan show only that the float for IAS was small, with corporate insiders owning most of IAS stock. Cox also downplays the importance of the information that the number of trades in IAS stock exceeded the average daily volume for OTC Bulletin Board securities. He points out that there is no evidence to indicate that the market for an average OTC Bulletin Board stock is efficient; further, IAS trading activity in IAS was far less than that of the average daily volume of stock traded on Nasdaq and the New York Stock Exchange. (Cox Aff. ¶¶ 20–22.)

Having considered the evidence, the court concludes that this factor does not weigh in favor of a conclusion that IAS traded in an efficient market.

### b. Reports by Securities Analysts.

Existence of such reports would suggest that investment professionals reviewed the reports and made trading recommendations to their investment clients based on the information in the reports. "In this way the market price of the stock would be bid up or down to reflect the financial information contained in the ... reports...." *Cammer*, 711 F.Supp. at 1286.

Plaintiffs presented no evidence of reports done by securities analysts and Cox states that he found none. The available information about IAS consisted of advertisements, press releases, and other information disseminated by the Defendants themselves. This type of information is not a substitute for reports made by securities analysts. Accordingly, this factor weighs against a finding of market efficiency.

### c. The Existence of Market Makers.

Market makers are those who announce their willingness to trade a specific number of shares at a specific price. The significance of this factor being that "these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer* at 1287. There were four firms continuously making a market in IAS stock during the class period; six other firms made a market in the stock at different times during the period. (Sheehan Aff. ¶ 9.) However, this evidence, standing alone, indicates little. As the *O'Neil* court noted:

> [I]t is impossible to accord much significance to the number of market makers, until one knows the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so. The economic literature has criticized reliance upon the num-

ber of market makers as an indicator of efficiency.

*Id.* at 501 (citations omitted). Therefore, this evidence of the number of market makers, without more, does not weigh in favor of a finding of an efficient market.[1]

### d. Eligibility to File an S–3 Registration Form.

■ There is no question that Defendants were not eligible to file an S–3 Registration Form. Eligible companies are required to disclose less information than is required of other filing companies. The SEC's rationale is that information concerning eligible companies is already widely available and therefore, need not be disseminated in the prospectus. *Harman v. LyphoMed, Inc.*, 122 F.R.D. 522, 526 n. 1 (N.D.Ill.1988). This factor is extremely important. "Although ineligibility does not automatically disqualify a company from a finding of an efficient market, this factor weighs heavily against a finding of efficiency." *O'Neil*, 165 F.R.D. at 502.

### e. History of Immediate Movement of Stock Price.

It is here that Plaintiffs make their best case that IAS traded in an efficient market. Their evidence shows that the price of IAS stock increased during the class period; Plaintiffs maintain that the increase was the result of fraudulent information circulated by Defendants about IAS technology. Sheehan particularly points to an increase from $34 per share on June 6, 1997, to $42.50 on June 10, 1997. According to Sheehan, the increase was attributable to a press release issued on June 10 claiming that "IAS will demonstrate to the world that Digital Wave Modulation (DWM) redefines the boundaries of science." (Sheehan Aff. ¶ 6.) Further, Sheehan maintains that the drop in the price from $40.00 on June 27, 1996, to $17.50 on June 28, 1996, was caused by Defendants' failure to unveil the promised technology. (*Id.* ¶ 7.)

While acknowledging that Defendants' information may have caused these price fluctuations, Cox argues that these reactions are

---

1. Plaintiffs themselves concede that "the number of market makers is not in and of itself an important element in determining efficiency."

(Plaintiffs' Reply Mem.Supp. Motion for Class Cert. at 24.)

not consistent with an efficient market. Cox points out that the same type of information as was released on June 10 had been available in April and May. Further, although the price of IAS stock continued to drop over the four days of trading after June 27, the price then increased to $24.50 on July 5. It is Cox's position that the length of time needed for the market to make these adjustments in price is not consistent with an efficient market. (Cox Aff. ¶¶ 17–18.)

Examination of the OTC Daily Trading Summary offered by Defendants at the hearing shows that throughout the class period, the price of IAS shares fluctuated. For example, on May 22, the price closed at $36.25; the following day, it rose to $50.00. Similarly, on May 30, the price closed at $54.00; yet by June 7, the price had decreased to $34.00. Plaintiffs offer no specific evidence that these, and other significant changes in the price, were in response to information about IAS. The far more likely conclusion is simply that the price history of IAS was volatile. Cox calculated the standard deviation of IAS's stock return, a widely-used measure of volatility, and found it to be 13%, which he concluded was "relatively high." (Cox Aff. ¶ 26.) Consideration of all the evidence on this factor does not support a finding of an efficient market. *See, O'Neil,* 165 F.R.D. at 502 (finding that price fluctuations in price of stock not indicative of efficient market, only that price history "appears to have been random and volatile.")

#### f. *Additional Factors.*

There are other factors that weigh against a finding that IAS stock traded in an efficient market. These include the high cost of trading IAS stock, measured by the inside bid-ask spread, and the fact that only one institutional investor held IAS stock. (Cox Aff. ¶¶ 23–27).

Based on the above, the court concludes that IAS stock was not traded in an efficient market, and Plaintiffs are not entitled to the presumption of reliance available under the fraud on the market theory.

Plaintiffs argue that even without the benefit of the presumption of reliance, indi-vidual questions of reliance would not predominate and class certification should still be granted. However, in light of the following statement from *Basic,* the court determines that Plaintiffs have failed to show that common questions of law and fact predominate over individual questions of individual class members:

Requiring proof of individualized reliance from each member of the proposed

plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common one.

485 U.S. at 242, 108 S.Ct. 978.

For the foregoing reasons, the court concludes that Plaintiffs have failed to meet the requirements of Rule 23 and hereby DENIES Plaintiffs' Motion for Class Certification.